AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   2:25-mj-04901-DUTY |
| JEFFREY YING, | ) | |
| aka "Jason Wang," | ) | |
| aka "Alan Fujimori," | ) | |
| aka "Austin Chen," | ) | |
| | ) | |
| _Defendant(s)_ | | |

**FILED**
CLERK, U.S. DISTRICT COURT

8/6/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ___clee___ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   December 2024 through July 2025   in the county of   Los Angeles   in the

Central   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 668(b)(1) | Theft of Major Artwork |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

/s/
_Complainant's signature_

Allen Grove, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date:   08/06/2025

_Judge's signature_

City and state:   Los Angeles, CA

Hon. Steve Kim, United States Magistrate Judge
_Printed name and title_

_AUSA:_ M. Williams, ext. 3359

**<u>AFFIDAVIT</u>**

I, Allen Grove, being duly sworn, declare and state as follows:

## I.  <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2015.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I received basic law enforcement training at the FBI Academy in Quantico, Virginia.  I am currently assigned to an Organized Crime Squad at the Los Angeles Field Office of the FBI, and the FBI's Art Crime Team.  On the Art Crime Team, my current responsibilities involve the investigation of art theft, art fraud, and other criminal violations related to art, cultural artifacts, and antiquities.  I have attended classes and courses conducted by the FBI and other agencies regarding art fraud and art and antiquities theft and smuggling.  As a result of my training and experience, I am familiar with how individuals fraudulently represent non-authentic artwork as original artwork and create false documentation to mislead purchasers of the artwork.  I am also familiar with the patterns generally utilized by co-conspirators in these schemes to conceal their true identity and involvement in the negotiations with buyers by using e-mail communications as a primary means of contact.  I have also participated in the execution of numerous

search and arrest warrants.  Prior to joining the FBI, I was a
Deputy District Attorney in California for approximately four
years, where I prosecuted all manner of state level criminal
offenses.

2.    During the course of my employment with the FBI, I
have gained knowledge in the use of various investigative
techniques including the review of telephone, e-mail, and text
messaging transaction records, utilization of wiretaps, physical
surveillance, undercover agents, confidential informants,
electronic surveillance, consensually monitored recordings,
investigative interviews, financial investigations, and the
execution of search and arrest warrants.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal
complaint against and arrest warrant for JEFFREY YING, also
known as JASON WANG, ALAN FUJIMORI, and AUSTIN CHEN ("YING") for
a violation of 18 U.S.C. § 668(b)(1) (theft of major artwork).
This affidavit is also made in support of a search warrant for
YING's iPhone 14 (the "SUBJECT DEVICE") described in Attachment
A, for the items to be seized described in Attachment B.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrants and does not purport to set forth all of my knowledge
of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. SUBJECT DEVICE TO BE SEARCHED

5.    The SUBJECT DEVICE to be searched is an iPhone 14 described in Attachment A, which is incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

6.    The items to be seized are the contraband, evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 668(b)(1) (theft of major artwork) (the "Subject Offense"), as described in Attachment B, which is incorporated herein by reference.

### V.  SUMMARY OF PROBABLE CAUSE

7.    Between in or about December 2024 and July 2025, YING has stolen approximately $216,000 worth of rare and ancient Chinese manuscripts from the UCLA Library system.  YING generally rents the manuscripts, brings them home for days at a time, and then returns a dummy manuscript instead of the authentic one.  YING generally travels to and from China within several days of the thefts.  When law enforcement searched YING's hotel room pursuant to a state search warrant they found blank manuscripts and paperwork in the style and manner of the books that YING had requested to check out from UCLA, in addition to pre-made labels known as asset tags associated with the same manuscripts that could be used to create "dummy" books

3

to return to the library in place of the original books.  When
UCLA Police Officers arrested YING on August 5, 2025, they found
a fraudulent California identification card in the name of
AUSTIN CHEN along with two library cards in the names of AUSTIN
CHEN and JASON WANG.

VI. <u>STATEMENT OF PROBABLE CAUSE</u>

    A.    <u>The UCLA Library System</u>

8.   UCLA maintains an organized, permanent, and extensive
library system located in Los Angeles, California.  The UCLA
Southern Regional Library System ("UCLA-SRL") is located at 305
De Neve Drive, Los Angeles, California.  It is part of the
larger UCLA state educational system and contains many
conventional and rare books, manuscripts, and artwork, some of
which is over 100 years old.  The UCLA Young Research Library
("UCLA-YRL") is part of the same library system, as are the UCLA
Library Special Collections and UCLA East Asian Library, all of
which are located in and around Los Angeles, California.

9.   Many of the materials in the UCLA library system,
including UCLA-SRL and UCLA-YRL, are available to the public to
view and/or check out for educational, research, and other
purposes.  The UCLA library system also employs librarians and
other professional staff.

10.   The UCLA library system, including UCLA-SRL and UCLA-
YRL, owns, utilizes, and cares for tangible objects, such as
books, manuscripts, and writings, that are displayed and/or
exhibited to the public.  UCLA also allows the public to view
and check out items.

11.  The UCLA library system has acquired its collections from purchases and donations made from around the globe and across state lines in both interstate and foreign commerce.

**B.    Initial Thefts**

12.  I was recently contacted by the UCLA Police Department regarding the theft of rare books from the UCLA library system.

13.  Based on my discussions with the UCLA Police Department and others, as well as my review of reports, I learned the following, among other things:

a.    The Director of the UCLA Library Special Collections was notified by the head of UCLA East Asian Library that three rare Chinese books were missing from storage.  A preliminary interdepartmental investigation revealed the books were last viewed by a visitor who identified himself as "ALAN FUJIMORI."[1]

b.    Due to the books being "Non-Circulation Rare," the person requesting to view them must first reserve the books to be viewed on a specific date, and time.  The reservation process requires the books to be transferred from their secured storage at UCLA-SRL to UCLA-YRL.

c.    The person who made the request must check-in with front desk staff at UCLA-YRL, upon which time, the books are presented for review in a box affixed with asset tags.  The asset tags are adhered to the box and the books themselves. Upon completion of viewing, the books are returned in the box to

---

[1] As discussed below, "ALAN FUJIMORI" was later identified as YING after reviewing surveillance footage and driver's license information.

YRL Staff.  Ultimately, the books are transported back to UCLA-SRL for safekeeping.

d.  Here, the box containing the rare books was in fact located but the contents were not the original items presented to "ALAN FUJIMORI."  Upon opening the box, UCLA staff discovered that the rare Chinese books were replaced with other "dummy" books, affixed with erroneous asset tags.

e.  UCLA staff reports receiving information that the name "ALAN FUJIMORI" is associated with a known book thief responsible for committing similar theft incidents at UC Berkley.

f.  The following chart summarizes the rare Chinese books taken by "ALAN FUJIMORI" from the UCLA library system and not returned:

| Book Title | Check Out Date Requested | Year Published | Value |
|---|---|---|---|
| Tang shi pin hui [90 juan, shi yi 10 juan] Gao Bing bian ji. 882902, 882903 | February 27, 2020 | 1393 | $69,677 |
| Ji gu yin pu, Wang Chang bian, Gu Congde jiao. | February 26, 2020 | 1575 | $62,709 |

C.    **Additional Thefts**

14.    Based on my discussions with the UCLA Police
Department and others, as well as my review of reports, I also
learned the following, among other things:

a.    On 10/15/2024, 12/12/2024, 12/16/2024, and
12/18/2024, a subject who identified himself as "JASON WANG"
requested to check out six rare Chinese books.  On 8/05/2025, a
subject identified as "AUSTIN CHEN" requested to check out and
review eight more rare Chinese books.

b.    Due to the rarity and value of the books, they
are not in regular circulation in the library.  The books must
be reserved and checked out.  Up until a very recent change in
library policy, an individual could check out books by merely
requesting and obtaining a library card through an online
request, which did not require showing a government issued
identification or even a photograph.

c.    After books were requested by YING, the books
were transferred from their secure storage at UCLA-SRL to UCLA-
YRL located in Los Angeles, California, so that YING could
review and check them out of the library.  YING also requested
books from UC-San Diego and UC-Irvine via a page system that
UCLA operates to retrieve books from the collections of other UC
campuses in Southern California, and those books were
transferred to the UCLA library system.

d.    Upon arriving and receiving temporary possession
of the books at UCLA-YRL, YING, using library accounts
associated with the above listed aliases, removed the books from

the library.  Instead of returning the original books, YING
returned "dummy" (not the original) books of little to no value
instead and kept the original books.

   e.   Upon return of books to the library, the general
practice of the library staff does not include a thorough review
of the item being returned.  The books may also be returned via
a drop box system and not directly to a person.

   f.   At a later date, UCLA-SRL staff opened the box
containing the books purportedly returned by YING and observed
that the books inside were not the original books checked out by
YING.  Instead, the original books had been replaced with other
"dummy" books.  The dummy books also were affixed with new false
asset tags (similar to the tags later found in YING's hotel
room).

   g.   Believing that ALAN FUJIMORI, JASON WANG, and
AUSTIN CHEN were the same person, the UCLA Library staff began
reviewing all documents related to these individuals.  The
library staff also reviewed security camera footage from the
thefts and distributed it to their staff.  The library staff who
checked the books out to YING identified FUJIMORI, WANG, and
CHEN as the same person (YING).  The library staff then went
back and reviewed the library card applications that YING filled
out and later provided UCLA Police Officers with this
information.

   h.   YING used UCLA Library Patron Cards associated
with the names JASON WANG and AUSTIN CHEN to check out the books
listed below from UCLA-YRL.

i.  The following books were checked out and taken by YING from UCLA (and never returned):

| Title | Check Out Date | Dummy Book Return Date | Value |
|---|---|---|---|
| MI YUN LOU CONG SHU {7 ZHONG} VOL. 1-10, (1923-1924) | Dec. 16, 2024 | Dec. 20, 2024 | $274 |
| MI YUN LOU CONG SHU {7 ZHONG} VOL. 11-20, (1923-1924) | Dec. 16, 2024 | Dec. 20, 2024 | $274 |
| YU ZHI GU WEN YUAN JIAN/ XUQIANXUE DENG FENG ZHI BIAN ZHU BOX 1, (1685) | Dec. 18, 2024 | Dec. 20, 2024 | $16, 715 |
| YU ZHI GU WEN YUAN JIAN/ XUQIANXUE DENG FENG ZHI BIAN ZHU BOX 2,(1685) | Dec. 18, 2024 | Dec. 20, 2024 | $16,715 |
| 1.  SHI ZHU ZHAI SHU HUA PU/ HU YUECONG {ZHENGYAN} MO GU; ZHANG XUEGE 16 VOLUMES IN 1, (1817). | Dec. 12, 2024 | Dec. 16, 2024 | $11,143 |
| SHE YUAN MO CUI/ TAO XIANG JI KAN VOL9-14, (1929). | Oct. 15, 2024 | Oct. 17, 2024 | $41,788 |

15.   In addition, YING requested and then checked out from the UCLA library system additional books on July 3, 2025.  One of the books that YING checked out from UCLA was "Ou xiang ling shi : [39 zhong] / [Miao Quansun ji]," published in 1910.  That book had an estimated value of $5,300.  The original book was never returned by YING.  Instead of returning the original book, a "dummy" book was returned on or about July 7, 2025.

D.   **YING's Aliases**

16.   I reviewed a surveillance image taken by UCLA surveillance cameras during the time of one of the thefts and compared it to a photo on file with the California Department of Motor vehicles for YING.  The individual in the surveillance footage appears to match the image of YING in the driver's license photo.

17.   Based upon my training and experience, I believe YING is the same individual as ALAN FUJIMORI, JASON WANG, and AUSTIN CHEN, which are all aliases that YING is using.

E.   **YING's Travel**

18.   I have reviewed travel records for YING.  Most recently, YING travelled to Los Angeles from Hong Kong on August 5, 2025.  YING had a return flight to China set for August 6, 2025, at approximately 1:00 PM.

19.   YING's prior international travel coincides similarly with thefts from the UCLA library system.  For example, YING traveled to Los Angeles from Seoul, South Korea, on July 1, 2025 and departed Los Angeles to Seoul, South Korea, on July 4, 2025.  YING also traveled to San Francisco from Shanghai on December

13, 2024, and then returned to Shanghai on December 21, 2024.
YING also traveled from Hong Kong to Los Angeles on October 15,
2024 and then returned to Hong Kong from Los Angeles on October
18, 2024.

      **F.**    **YING's Arrest**

     20.  Based on the above information, the UCLA Police
Department trained library personnel to contact officers should
YING arrive back on campus to check out books.  On August 5,
2025, YING arrived at a UCLA library to check out additional
books.  UCLA Police was notified and arrested YING without
incident.

     21.  During a search incident to arrest, officers located a
fraudulent California identification card in the name of AUSTIN
CHEN, and two library cards, one under the name AUSTIN CHEN, and
one under the name JASON WANG.  Officers found a hotel keycard
for the Hotel Angeleno, in Los Angeles, California,
approximately three miles away from the UCLA library.

     22.  Additionally, at the time of YING's arrest, YING was
in possession of a purple iPhone (the SUBJECT DEVICE), which was
also seized by law enforcement officers.

      **G.**    **Search of YING's Hotel Room**

     23.  On August 6, 2025, officers and detectives with the
UCLA Police Department obtained and executed a search warrant at
YING's room at Hotel Angelino.  The search revealed items
connected to the scheme to replace books, including "dummy"
materials such as blank manuscript books that appear similar in

nature to the valuable ones that YING was attempting to check out.

24. Additionally, YING had the printed names of the books on computer paper, that matched the style of the labels that were affixed to the "dummy" books that he previously returned.

## VII. **TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES**

25. As used herein, the term "digital device" includes the SUBJECT DEVICE.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

27. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

28. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

29. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

30. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

32.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

33.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

34.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress YING's thumb and/or fingers on the device(s); and (2) hold the device in front of YING's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    <u>CONCLUSION</u>

35.  For all the reasons described above, there is probable cause to believe that JEFFREY YING, also known as JASON WANG, ALAN FUJIMORI, and AUSTIN CHEN, violated 18 U.S.C. § 668(b)(1) (theft of major artwork).

36.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute contraband,

evidence, fruits, and instrumentalities of violations of the Subject Offense will be found on the SUBJECT DEVICE, as described in Attachment A.

/s/
_____
Allen Grove, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 6th day of August, 2025.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

SUBJECT DEVICE TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), which was seized on August 5, 2025, and is currently maintained in the custody of the UCLA Police Department in Los Angeles, California:

1.    One Purple iPhone 14 seized from JEFFREY YING at the time of his arrest.

i

### ATTACHMENT B

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are fruits, instrumentalities, contraband, and evidence of violations of 18 U.S.C. § 668(b)(1) (theft of major artwork) (the "Subject Offense"), from January 1, 2020, through August 6, 2025, namely:

        a.   All records related to books and other materials checked out, obtained, stolen, and/or taken from UCLA or any other library system;

        b.   All records related to books that were checked out, obtained, transported, purchased, and/or sold;

        c.   All records related to the creation of "dummy," fake, replacement, and/or fraudulent books;

        d.   All identification documents and other records related to JASON WANG, ALAN FUJIMORI, AUSTIN CHEN, and/or other aliases used by YING;

        e.   All photographs, videos, messaging, and/or correspondence related to any of the foregoing categories; and

        f.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

        g.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

                i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

i

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

h.   s used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II. **SEARCH PROCEDURE FOR THE SUBJECT DEVICE**

2.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed one year from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this one-year period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

e.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

f.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

g.   The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

h.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

i.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

j.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

k.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

l.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

m.    After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

n.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

o.    During the execution of this search warrant, law enforcement is permitted to (1) depress YING's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of YING's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in

order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

       p.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.